RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT KYLE,

              *Plaintiff-Appellant,*

      *v.*

COMMISSIONER OF SOCIAL SECURITY,

              *Defendant-Appellee.*

No. 09-3628

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 08-00191—Susan J. Dlott, Chief District Judge.

Argued: April 30, 2010

Decided and Filed: June 28, 2010

Before: GIBBONS and GRIFFIN, Circuit Judges; DOWD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Shoshana R. Pehowic, O'CONNOR, ACCIANI & LEVY, Cincinnati, Ohio, for Appellant. Edward P. Studzinski, OFFICE OF THE GENERAL COUNSEL, SOCIAL SECURITY ADMINISTRATION, Chicago, Illinois, for Appellee. **ON BRIEF:** Shoshana R. Pehowic, Eric P. Allen, O'CONNOR, ACCIANI & LEVY, Cincinnati, Ohio, for Appellant. Depak Sathy, OFFICE OF THE GENERAL COUNSEL, SOCIAL SECURITY ADMINISTRATION, Chicago, Illinois, for Appellee.

_____

## OPINION

_____

DOWD, Senior District Judge. Robert Kyle (Kyle) was 48 years old when he was terminated from his position as a supervisor for laminent manufacturer Formica

_____

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

Corporation on March 31, 2003. At the time of his termination, Kyle suffered from morbid obesity and related conditions. He filed an application for Social Security disability benefits ten months later on January 20, 2004. At his hearing, the Administrative Law Judge (ALJ) found that his complaints were "not entirely credible," but determined, nonetheless, that Kyle was not able to perform any past relevant work. The ALJ determined further, however, that Kyle had acquired skills from his past relevant work that were transferable to other occupations existing in significant numbers in the national economy. The ALJ specifically relied on the opinion of vocational expert (VE) George Parsons, PhD, who stated that Kyle acquired past relevant work skills, especially supervisory skills, that would transfer to other jobs. Based on this finding, the ALJ determined Kyle was not disabled for Social Security purposes. Kyle's request for review was denied by the Appeals Council of the Social Security Administration (Appeals Council), and he filed a civil action in the federal district court.

The district court issued an order affirming the Appeal Council's decision, finding that the ALJ did not make an error prejudicial to Kyle. Because this Court concludes that the ALJ had substantial evidence to make a finding that Kyle had acquired past relevant work skills that would transfer to other jobs, we affirm the judgment of the district court.

## I. BACKGROUND

### A.    Factual Background

Kyle was born on March 1, 1955 and completed the 11th grade. On March 31, 2003, in his seventeenth year of employment at Formica Corporation and his eleventh year as a supervisor, Kyle was terminated. Kyle suffered from morbid obesity, his weight ranging from 350-471 pounds. According to primary care physician (PCP) John C. Capurro, M.D., and orthopedic surgeon, S. Michael Lawhon, M.D., his diagnoses prior to 2003 included low back pain, hypertension, fluid retention, cardiomegaly,

degenerative joint disease (DJD) in both knees, a medial meniscus tear in his left knee, osteoarthritis, and chondromalacia.[1]

For ten months after he was terminated, Kyle looked for another job, but never worked again. He applied for disability in January 2004.

His medical records between 2003 and 2006 reveal that, after he was terminated from his job, he also developed degenerative changes in his lumbar spine, lumbago,[2] spinal stenosis, and recurrent perianal abscesses. He underwent ten days of physical therapy for low back pain in March 2004 and thirteen days in the winter 2006. He received a single steroid spinal injection in March 2006.

In a May 15, 2004 report, consultant Christopher Wright, M.D., described Kyle as a "massively obese middle-aged man who ambulates with a normal gait, and who is comfortable in both the sitting and standing positions." Wright diagnosed Kyle with morbid obesity, chronic back pain, left knee pain and elevated blood pressure, but found Kyle able to do moderate amounts of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects.

A June 8, 2004 Physical Residual Functional Capacity Assessment (RFC), completed by Jerry McCloud, M.D., noted that Kyle could stand or walk six hours per day, sit for six hours a day, and do unlimited pushing and pulling. The neurological exam was normal, although an x-ray of the knee showed "degenerative arthrosis,"[3] and an x-ray of the spine showed "degenerative changes in the lumbar spine."

Kyle's PCP Capurro, M.D., prepared a July 19, 2005 work assessment report concluding Kyle had DJD, degenerative disc disease (DDD), and hypertension. Capurro found Kyle could sit for no more than 2.5 hours per day and could never climb, balance, stoop, crouch , kneel, or crawl.

---

[1]Irritation to the cartilage under the kneecap.

[2]Lumbago is low back pain.

[3]Arthrosis means "joint."

In January 2007, Dana Bussing, M.D., prepared a RFC diagnosing facetogenic versus discogenic lower back pain[4] and bilateral knee osteoarthritis with a poor prognosis.  She reported that Kyle had pain after standing or walking for five minutes, but he did not complain of pain while sitting.  She noted that his symptoms would rarely be severe enough to interfere with the concentration needed to perform simple work and concluded that he could sit for 45 minutes without having to get up.

## B.        Procedural background

Kyle applied for Social Security disability insurance benefits on January 20, 2004.  In various written submissions, Kyle told the agency that for over ten years he supervised 48 employees at Formica, had authority to hire and fire them, and was responsible for making sure the production goals were achieved.

A hearing was held regarding his application on January 25, 2007 before an Administrative Law Judge (ALJ) in Cincinnati, Ohio.

## 1.        *Testimony of Robert Kyle*

Kyle testified that, initially, he was a Finishing Process Operator with Formica. His job was to carry, "flip," and sand or cut 21 pound sheets of formica.  He used regular hand tools and micrometers.[5]  Kyle "went into management" in 1992 with the title "supervisor in trim and sand."  Even after becoming a manager, Kyle was up and around his workers.  For example, Kyle showed the foremen how to pass the material through the machine and responded when he was called regarding a machine that was not working properly.    He wrote production, safety and accident reports, and also sometimes helped lift and carry the sheets of formica.

Kyle testified that a new supervisor came the year before Kyle was terminated. The supervisor "wanted more numbers" but Kyle, having "done it for 20 years," knew

---

[4]"Facetogenic" means relating to degeneration of the facets, or joints of the spine.  "Discogenic" means relating to degeneration of the intervertebral discs.

[5]A micrometer is a precision measurement device, usually in the shape of calipers.

the supervisor's way was not going to work. Despite this, Kyle "still got [the] job done." Kyle continued to receive assignments, complete his paperwork, and, although he "might go around the way to do it," achieved the same outcome. Kyle's "production numbers were good or better than anybody else. I didn't have no safety issues." One day, the supervisor called him in and said they were going to terminate him. He was essentially fired.

Kyle told the ALJ he could not perform his former job as a supervisor because he could not stand, climb around the machines, or handle materials like he did before. He testified that he could, however, perform a paperwork job at a desk if he were allowed to stand up and walk around every 20 minutes or so. He testified that he sent out resumes and searched for jobs for ten months after he was terminated. He sought both management positions and regular hourly work. While he received interviews, he never worked again.

With respect to physical exertion, Kyle testified that he climbed three steps to get into his home, but was "fine" once he got in. He could walk about 100 feet before he needed to rest.

**2.      *Testimony of Reviewing Medical Advisor Wayne Wheeler, M.D.***

Dr. Wheeler testified that Kyle suffered from morbid obesity, lower back pain, perianal abscesses and knee pain. In Wheeler's opinion, Kyle's RFC limited him to sedentary work where he would never bend or stoop, could sit for six hours, and had to have easy access to the job. Since Kyle already climbed three stairs to get into his home, climbing that to get to his job would be reasonable, but any more than that would be a challenge.

**3.      *Testimony of Vocational Expert George Parsons, PhD***

The VE testified that Kyle's previous job of "finishing process operator, laminate" would have Dictionary of Occupational Titles (DOT) number 584.682-014

and would be classified as medium work with an SVP of 5.[6]  Since there was no DOT number for Kyle's job as a laminate supervisor, the VE concluded that the DOT jobs that most closely fit the laminate supervisor job were the jobs of general production supervisor (DOT number 699.130-010, light work, SVP of 7,  making it skilled) and supervisor of coating machines (DOT number 554.137-014, light work, SVP of 7, making it also skilled).   According to the VE, the hypothetical man confined to the activities Dr. Wheeler described could not perform his past relevant work.

**4.        *VE Testimony That Kyle Had Transferable Supervisory Skills***

The VE testified that Kyle's skills were his ability to interact with others to get the production job done.  The VE also stated that, while Kyle used various micrometers and other types of tools in his work and had general knowledge of machines and machine operations, the supervisory part of Kyle's job made it skilled.  Specifically, the VE testified:

A:     Now the skills are obviously (INAUDIBLE).  He supervised 48 people
       so, you know, based upon that are skills that are his ability to interact
       with others to get  production done, and as he stated he's - - you know,
       they have to use various micrometers and other types of tools in order to
       be able to finish their work, and this, this general knowledge of
       machines, machine operations is what you're - - he did.  But it's really,
       it's really the supervision of 40 people that makes it skilled.

The ALJ asked the VE whether Kyle could perform other jobs to which his skills would transfer "without significant vocational adjustment?"[7]  The VE offered the opinion that, if Kyle could get into the building, he could perform other jobs at the sedentary level without significant vocational adjustment, such as an expediting clerk,

---

[6]The Dictionary of Occupational Titles is a reference, produced by the United States Department of Labor, listing thousands of jobs.  20 C.F.R. § 404.1566(d).  The abbreviation "SVP" is Specific Vocational Preparation, which is the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a job.

[7]It is unclear why the ALJ inquired in terms of "significant vocational adjustment" since Kyle was 52 at the time of the hearing.  The standard of "significant vocational adjustment" applies to evaluating transferability of skills in a category of older claimants, those of advanced age, age 55 or older.  20 C.F.R. § 404.1568(d)(4).

shipping and receiving clerk, and sedentary supervisor positions. When questioned by the ALJ, the VE testified as follows:

Q:    Could he perform other jobs to which his skills would transfer without significant vocational adjustment? Given that RFC.

A:    Well, here's the problem I've got with that testimony. I, I think there are other jobs. I mean he could be an expediting clerk. He could work as a shipping and receiving clerk. He could do those kinds of things at the sedentary level, but within that limitation was the entrance and exit egress separate to a company, and I have no way of knowing if he'd have to climb three stairs or not climb three stairs.

Q:    Well, he's climbing three stairs going into his house.

A:    I know but I'd have no way of knowing within the plant if he'd have to climb . . . but I can tell you that I think he could perform work as an inspector, as an expediting clerk, and in shipping and receiving, and I think he could go sedentary supervisor positions . . . .

The VE further testified that Kyle's skills could transfer to those positions even if products other than formica were involved, and further, Kyle testified that he had looked for "those kind of jobs." The VE responded to the ALJ's question in this regard as follows:

Q:    Well, could his skills transfer to those jobs with the - -

A:    Oh, yeah, yeah, the same thing. It's just different products. I mean, you know, as he said he looked for those kind of jobs.

The VE offered his opinion that Kyle's success supervising in the past supported the conclusion that Kyle had supervisory skills. When questioned by Kyle's attorney, the VE testified as follows:

Q:    I mean given, given that and his education, which is not even a high school diploma does he have the skills to do the paperwork that's required at these production supervisor jobs at Toyota and these other companies?

A:    Well, yeah, he, he's obviously demonstrated the ability to do the work. I mean he did it. Now as I stated his advantage was he learned the job, so that was an advantage for him particularly in Formica where they have laminates and coatings, because he knew those.

Q:    But in these other production supervisor jobs he does no longer have that advantage.

A:    Correct, but that's - - I, I don't have any way - - I mean obviously he has the ability to relate to people.  He ran 48 people.  He didn't - - I mean - - and he was beating production quotas, so he obviously knows how to do it.  Now his style may be different than somebody else's, and I can't testify to that, but obviously he can.

**5.        *VE Testimony That Jobs To Which Kyle
            Could Transfer Were Consistent with the DOT***

The VE testified as to four DOT jobs which existed in significant number and to which Kyle's skills could transfer.  He stated that there were 10,000 supervisory jobs in Cincinnati, and of those, "2,000-plus are in the sedentary [category.]"  The VE stated that there were 2,300 local general supervisor jobs, 366 local inspection jobs, 688 local expediting clerk jobs, and 869 shipping and receiving jobs that Kyle could do.  Specifically, the VE testified in response to questioning by the ALJ as follows:

A:    Yeah, I'm giving you, first line, supervisor production which is the job he had (INAUDIBLE).

Q:    All right.

A:    Twenty-three hundred in the local economy, 144,000 nationally.  DOT number representative 184.167-046.[8]  Inspection, local economy, 366.  51,000 nationally; DOT number representative 726.362-010.  Expediting Clerk, local economy, 688.  Nationally, 79,000; representative DOT number 221.367-066.  Last job, shipping and receiving clerk, local economy 869.  Nationally 111,000; DOT number 248.367-022.

Thereafter, the ALJ asked the VE if the jobs he testified about were suitable to Kyle's skills and consistent with the DOT.  The VE testified that they were.[9]

---

[8]The DOT job identified by 184.167-046 is "Incinerator Plant-General Supervisor."

[9]*See Austin v. Comm'r of Soc. Sec.*, No. 3:09 CV 723, 2010 WL 1170630, at *3 (N.D. Ohio March 23, 2010) for an example of VE testimony conflicting with the DOT description of a job. In that case, the claimant was limited to unskilled jobs. The VE testified there were three unskilled jobs he could perform and offered the DOT numbers for them. However, one of the DOT numbers described a job that was semi-skilled. This would have required the ALJ to perform an SSR 00-4p inquiry regarding the conflict between the VE's testimony and the DOT description of the job. The court held it was harmless error, however, as the other two positions the VE described were unskilled jobs. The type of conflict the SSR (Social Security Ruling) 00-4p inquiry anticipates is not between the type of job claimant performed

## 6.    *The ALJ's Decision*

The ALJ determined that Kyle was not disabled.  In her decision, the ALJ found that Kyle was unable to perform any past relevant work.  She found that Kyle was 48 years old as of his disability onset date (January 2004) and considered a "younger individual" (age 45-49).  She found, further, that Kyle became an individual closely approaching advanced age[10] as of February 28, 2005, the day before his 50th birthday.[11] She found Kyle had a limited education, and, based on the VE's testimony, that Kyle had skilled past relevant work as a supervisor, work that had an SVP of 7 and required the skills of interacting with others and supervising their work, knowledge of machines and machine operations, knowledge of tools, and paperwork skills, including performance appraisals of employees and writing reports in general.[12]  She determined that, based on the Medical-Vocational Grid (20 C.F.R. Part 404, Subpart P, Appendix 2), Kyle had transferable skills.  Specifically, she held that, considering Kyle's age, education, work experience and residual functional capacity, Kyle had skills that were transferable to other occupations with jobs existing in significant numbers in the national economy.

The ALJ relied on the VE's testimony that the skills Kyle acquired through his past relevant work would be transferable.  She relied on the VE's testimony that Kyle could perform the sedentary job of inspector, of which there were 366 jobs in the local economy; the sedentary job of expediting clerk, of which there were 688 jobs in the local economy; the sedentary job of production supervisor, of which there were 2,300 jobs in the local economy; or the sedentary job of shipping/receiving clerk, of which there were 248 jobs in the local economy.  The ALJ determined that the VE's testimony was

in the past and that which the VE opines his skills can transfer to in the future, but a conflict between the type of jobs the claimant has been determined by an MD and VE to be able to perform and the DOT description of the capabilities and skills required to do the job.

[10]Age 50-54.

[11]Kyle was 52 and remained in this age group on the date of the ALJ's opinion, March 20, 2007.

[12]The ALJ also stated that the "vocational expert said these skills would also transfer to other jobs at the sedentary level without significant adjustment."  In fact, the VE said "it could be" that there would be a significant vocational adjustment upon the transfer to other jobs.  Since Kyle did not raise this as an issue in his appeal, however, this Court will not address it here.

consistent with the DOT, as set forth by the requirements of SSR 00-4p[13] and that such numbers constituted a significant number of jobs.

Based on these findings, the testimony of the VE, and the record as a whole, the ALJ concluded that Kyle acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers. The ALJ held, accordingly, that Kyle was not disabled under the framework of Medical-Vocational Rule 201.11[14] from February 28, 2005 until March 20, 2007 (the date of her decision) and not disabled under the framework of Medical-Vocational Rule 201.20[15] from March 31, 2003 through February 27, 2005.

The Appeals Council denied Kyle's request for review on January 24, 2008, making the ALJ's decision the final decision of the Commissioner of Social Security (Commissioner).

Kyle then filed a civil action in the United States District Court for the Southern District of Ohio, seeking a reversal of the ALJ's findings. The magistrate judge recommended that the decision of the Commissioner be affirmed, and the district court adopted that recommendation. Kyle now appeals.

## II. ANALYSIS

### A.     Standard of Review

This Court exercises *de novo* review of district court decisions in Social Security disability cases. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009). The Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial

---

[13]The ALJ does not identify that upon which she relied in making this determination, although the testimony from the hearing demonstrates she asked the VE outright if his testimony was consistent with the DOT.

[14]Rule 201.11 applies to individuals closely approaching advanced age, 50-55.

[15]Rule 201.20 applies to "younger persons" age 45-49.

evidence in the record.  *White*, 572 F.3d at 281 *(citing* 42 U.S.C. § 405 (g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lindsley*, 560 F.3d at 604 (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Walker v. Sec'y of Health and Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992); *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 522 (6th Cir. 2008) (noting that substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted).

In deciding whether to affirm the Commissioner's decision, "it is not necessary that this Court agree with the Commissioner's finding, as long as it is substantially supported in the record." *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed.Appx. 163, 167 (6th Cir. 2009).  Even if this Court might have reached a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence.  *Lindsley,* 560 F.3d at 604-05 (administrative findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion) (quoting *Felisky v. Bowen,* 35 F.3d 1027, 1035 (6th Cir. 1994)); *Roe v. Apfel*, 211 F.3d 1270, at *7 (6th Cir. April 25, 2000) (unpublished table decision).

**B.      The ALJ's Factual Determination That Kyle Possessed Supervisory Skills Transferable To Other Jobs Was Supported By Substantial Evidence**

The ALJ determines disability using a five-step sequential analysis.  20 C.F.R. § 404.1520; *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed.Appx. 771, 774 (6th Cir. 2008).  She must determine, first, whether the claimant is working; second, whether the alleged impairment is severe; third, whether the impairment meets or equals a listed impairment and hence has a certain level of severity; fourth, whether the claimant can still do past relevant work; and, finally, when considering the claimant's age, education, work experience, and residual functional capacity, whether the claimant can do other work.  *Id*. (*citing* 20 C.F.R. § 404.1520(a)(4)(i-v)).  The burden is on the claimant to satisfy the first four steps.  *Id.*  Thereafter, the burden shifts to the Commissioner at step five to show "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."

*McGlothin*, 299 Fed.Appx. at 522; *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1053 (6th Cir. 1983); 20 C.F.R. § 404.1520 (g)(1).

An ALJ can use Medical-Vocational guidelines or "grids," found at 20 C.F.R. Part 404, Subpart P, Appendix 2, at the fifth step of the disability determination after the claimant has been found not to meet the requirements of a listed impairment, but found nevertheless incapable of performing past relevant work. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423-24 (6th Cir. 2008). Normally, where a claimant suffers from an impairment limiting only his strength (i.e., exertional limitations), the SSA can satisfy its burden through reference to the grids. *Id.* at 424. The grids, in conjunction with the claimant's RFC, age, education and work experience, are used to determine whether the claimant can successfully adjust to other work. Rule 201.20 of the grid shows that a Younger Individual (ages 45-49) with limited or less education and skilled or semi-skilled previous work experience and transferable skills will be found "not disabled." Likewise, Rule 201.11 sets forth that an individual closely approaching advanced age (ages 50-55) with the limited or less education, skilled or semi-skilled previous past work experience and transferable skills will be found "not disabled."

To establish that work exists in the national economy, the ALJ can rely on evidence such as the testimony of a VE and the DOT. The ALJ takes administrative notice of reliable job information available from various governmental publications such as the DOT, published by the Department of Labor. 20 C.F.R. § 404.1566(d). The ALJ can also use the services of a VE to help determine whether a claimant's work skills can be used in other work, and, if so, the specific occupations in which they can be used. 20 C.F.R. § 404.1566(e); *Beinlich*, 345 Fed.Appx. at 168.

The ALJ must then assess whether the claimant has transferable skills pursuant to 20 C.F.R. § 404.1568(d)(1)-(3) and SSR 82-41. The claimant is considered to have transferable skills when skilled or semi-skilled work activities the claimant did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kids of work. According to the statute:

Transferability is most probable and meaningful among jobs in which - -

     (i)     The same or a lesser degree of skill is required;

     (ii)    The same or similar tools and machines are used; and

     (iii)   The same or similar raw materials, products, processes, or services are involved.

20 C.F.R. § 404.1568(d)(2)

There are varying degrees of transferability. All of the subsets of 1568(d)(2) need not be met for skills to be transferable. "There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability." 20 C.F.R. § 404.1568(d)(3); *see Thompson v. Comm'r of Soc. Sec.*, 2008 WL 850167, at * 4 (S.D. Ohio March 28, 2008); *see also Faison v. Sec'y of Health & Human Servs.*, 679 F.2d 598, 600 (6th Cir. 1982).

**1.**     *Supervising Similar Industries, Tools and Raw Materials*

Kyle argues the ALJ erred in finding there was substantial evidence of jobs to which Kyle could transfer skills. Kyle's argument is, essentially, that the ALJ erred in relying on the VE because the DOT positions[16] the VE suggested were not in the same industry nor did they involve the same skills, tools or raw materials as the laminates industry. He argues, further, as to supervisory skills, that since the supervisory jobs that the VE suggested were not in the same industry and did not use the same tools, materials or processes, it was not likely that Kyle would have sufficient knowledge of the work being done to properly supervise the employees.

The standard of transferability of skills is that transferability is "most probable and meaningful" if the jobs involve the same or less skill, same or similar tools/machines and same or similar raw materials, products, processes or services. 20 C.F.R. § 404.1568(d); *Thompson*, 2008 WL 850167, at * 4. The statute does not say the jobs

---

[16]The VE offered, 1) Production Supervisor: DOT 184.167-046 (Incinerator-plant-general supervisor), 2) Inspector: DOT 726.362-010 (Group Leader, Semiconductor testing), 3) Expediting Clerk: DOT 221.367-066 (Scheduler, maintenance or Dispatcher, maintenance), and 4) Shipping/receiving clerk: DOT 248.367-022 (Container coordinator).

must have these features for a claimant's skills to transfer to them. The VE listed the DOT numbers of four jobs to which Kyle's skills could transfer and the ALJ was correct to rely on this testimony, given the VE's ability to tailor his findings to an "individual's particular residual functional capacity." *Beinlich*, 345 Fed.Appx. at 168 (*quoting Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003)). The fact that the DOT codes revealed these were jobs dissimilar to the laminates industry is not an indication Kyle's skills could not transfer to them. Most importantly, regardless of the tools or materials in Kyle's past industry, the VE repeatedly emphasized the supervision skill as the transferable skill stating "he's obviously demonstrated the ability to do the [production supervisor] work . . ." and "obviously he has the ability to relate to people. . . . [H]e was beating production quotas, so he obviously knows how to do it." Kyle indicated he was in charge of hiring and firing over 40 people for more than ten years. The VE testified that, of his skills, the supervisory skills were the most important. Therefore, this Court finds the ALJ had substantial evidence on which to base her opinion that Kyle had transferable skills and will not disturb the ALJ's findings. *Howard v. Comm'r Soc. Sec.*, 276 F.3d 235, 237 (6th Cir. 2002).

This Court agrees that the VE's testimony may suggest Kyle's supervisory skills would be useful only if transferred to an industry in which he had experience. However, this Court finds the ALJ relied on the VE's ultimate opinion that Kyle's skills were transferable, and this testimony served as substantial evidence upon which it was proper for the ALJ to rely. *Beinlich*, 345 Fed.Appx. at 167; *Wright*, 321 F.3d at 616. Further, even if this Court had come to a different factual conclusion, it would not disturb the findings of the ALJ which are based on substantial evidence. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983); *Germany-Johnson*, 313 Fed. Appx. at 774-75; *Lindsley,* 560 F.3d at 604-05.

**2.      *Transferability of Traits or Skills***

Kyle argues, additionally, that the VE's testimony regarding transferable skills actually addressed traits and therefore it was error for the ALJ to rely on the testimony. The evidence demonstrates that the VE relied on the learned skill of interacting with

people.   Successfully supervising 48 people is evidence of developed or acquired aptitudes or abilities, not an unlearned trait.  *Blake v. Sec'y of Health & Human Servs.*, 528 F.Supp. 881, 885 (E.D. Mich. 1981); *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 921(6th Cir. 1987); *Ellington v. Sec'y of Health & Human Servs.,* 738 F.2d 159, 161 (6th Cir. 1984).  In addition, SSR 82-41 defines a skill as:

> knowledge of a work activity which requires the exercise of a significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).  It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.

SSR 82-41.

Kyle was also exceeding company quotas while supervising his employees.  In *Bogema v. Sec'y of Health & Human Servs.*, 787 F.2d 588 (6th Cir. 1986) (Table), a bartender with eight years experience, whose job included overseeing two waitresses, asserted that the ALJ relied on a VE's itemization of aptitudes, not skills, and therefore did not have substantial evidence of transferable job skills.  The VE testified plaintiff had the skills of working with people, handling money, purchasing, ordering and receiving stock, and handling difficult people.  The district court found that these were not aptitudes, but "acquired skills" and that "overseeing the work of others to make sure they do their jobs over a period of years entails more than a simple 'aptitude' for 'responding appropriately to coworkers.'" *Id.* at *3.  Likewise, Kyle's capabilities overseeing over 40 worker for over 10 years with production numbers that were as "good or better than anybody else['s]" are properly categorized as skills.  The ALJ made no error relying on the VE's testimony that Kyle had transferable supervisory skills and her decision, therefore, will not be disturbed. *Richardson*, 402 U.S. at 401.

**3.      *Jobs To Which the VE Testified Kyle
          Could Transfer Were Consistent With the DOT***

Kyle does not state in what way the VE's opinion of transferable jobs contradicted the DOT. The implication from the argument is that there is a conflict because the jobs do not "truly fit" into Kyle's past job experience. For example, Kyle argues that the description of the DOT supervisor position suggested (incinerator-plant-general supervisor of production), and the inspection job (group leader, semiconductor testing) contradicted, what the VE stated were applicable to Kyle. However, this is not a "conflict" of the type anticipated by SSR 00-4p. *See Lindsley,* 560 F.3d at 605-07; *Austin v. Comm'r of Soc. Sec.*, 2010 WL 1170630, at *3 (N.D. Ohio March 23, 2010) (where ALJ relies on testimony of the VE that conflicts with DOT, ALJ must elicit a reasonable explanation; however, mere fact that VE identifies an occupation not described by DOT is not a conflict as DOT contains information about most, but not all, occupations). The VE acknowledged that these industries were not laminate industry position, but in his professional opinion, Kyle could perform them. Further, even if a conflict existed, the ALJ inquired properly if the VE's testimony was consistent with the DOT and was given a response in the affirmative. Therefore, the ALJ met her obligation under SSR 00-4p and there was no error relying on the positions the VE offered.

## III.  CONCLUSION

For all of the reasons set forth above, this Court AFFIRMS the judgment of the district court.