NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0639n.06

No. 12-6226

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jul 09, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BETH ANN LEE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| COMMISSIONER OF SOCIAL SECURITY, | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) | |

Before:  GIBBONS, STRANCH, Circuit Judges, and HOOD, District Judge.[*]

**JANE B. STRANCH, Circuit Judge.**  Beth Ann Lee applied for disability benefits on January 15, 2010, claiming she became disabled due to bipolar disorder on September 18, 2009. An administrative law judge (ALJ) denied Lee's application on February 25, 2011. Lee appealed that denial and simultaneously filed a new benefits application. Without stating the reasons for its determination, the Social Security Administration granted Lee benefits on her subsequent application on September 24, 2011, finding she became disabled on February 26, 2011, the day after the hearing on her initial application. Lee now appeals the denial of her first application. Because the ALJ followed the Administration's regulations, and because the subsequent favorable decision, standing alone, is not new and material evidence that requires remand to the ALJ, we **AFFIRM** the district court's order upholding the Commissioner's denial of Lee's initial application.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. BACKGROUND

Beth Ann Lee filed an application for disability benefits on January 15, 2010, alleging that bipolar disorder limited her ability to work. She was 45 years old at the time. Lee previously worked as a hotel desk clerk, cashier, convenience store assistant manager, and assembly-line worker, and was terminated from her last job as a warehouse stocker on September 18, 2009. She has not worked since then.

Dr. James Pulliam, Lee's primary-care physician from December 2, 1996, through March 2, 2010, diagnosed Lee with bipolar disorder, chronic anxiety, depression, gastroesophageal reflux disease, and chronic obstructive pulmonary disease. On September 23, 2009, five days after her alleged disability onset date, Dr. Pulliam stated that Lee was in a fragile emotional state but opined that she could return to work in a week's time. On October 22, 2009, he altered his view and suggested that Lee's chronic anxiety and depression were serious enough to keep her out of work through January 2, 2010. Days later, however, he reverted to his original assessment and said Lee could work again on October 30, 2009.

On April 8, 2010, Dr. D. Catherine Miller performed Lee's psychiatric disability evaluation. Dr. Miller noted that Lee visited a mental-health specialist on just two occasions and never completed an evaluation sufficient for a diagnosis. Lee's recitation of her history did not suggest psychotic or manic presentation to Dr. Miller. In response to Dr. Miller's questions, Lee denied using drugs but acknowledged drinking alcohol "every now and then." Later, though, she admitted to drinking "quite a bit" the prior year and stated she had "a DUI" during that period (though the charges were dropped). Dr. Miller noted that Lee's speech was spontaneous and non-pressured, she

was alert and fully oriented, she showed no memory deficits, her attention and concentration were no more than mildly impaired, and her insight and judgment were fair. Lee's complaints, Dr. Miller observed, were inconsistent with either bipolar disorder or psychosis; instead, she reasoned, the bipolar diagnosis was likely due to Lee's issues with Xanax. Dr. Miller diagnosed Lee with depression and anxiety, not otherwise specified. And she ultimately concluded that Lee was unlikely to keep a job until she was weaned off of narcotics, benzodiazepines and alcohol, at which point Lee's underlying psychiatric issues could be determined.

On April 10, 2010, Lee saw Dr. Matthew Harkenrider, a consultative examiner, for a physical examination. She told Dr. Harkenrider that she drank one to two whiskies a week and smoked a pack of cigarettes daily. Lee's physical examination was unremarkable aside from decreased but insignificant range of motion in her neck. As to her mental status, Dr. Harkenrider observed Lee's speech was non-pressured, her thought process was clear, her affect was not blunted, and her mood was appropriate. He opined that she had mild limitations in job-related activities and activities of daily living related to depression and anxiety.

Dr. Richard Wan replaced Dr. Pulliam as Lee's primary-care physician when the latter retired in 2010. Lee saw Dr. Wan three times in July and August 2010 for various physical ailments, including complaints of joint and muscle pain, weakness and numbness, cough and wheezing, and depression and anxiety. Dr. Wan prescribed Lee hydrocodone, fluoxetine, and klonopin for back and neck pain. His notes indicate that Lee had normal neurological or musculoskeletal examinations. A nerve conduction study showed mild left sensory carpal tunnel syndrome and mild left sensory ulnar neuropathy. Further imaging showed cervical and lumbar degenerative disc disease.

Lee began individual therapy at LifeSkills, Inc., a behavioral therapy facility, in August 2010. Dr. Leroy Buck, a psychiatrist who saw her there, noted Lee had fair judgment, insight, and memory. Although Lee denied drinking alcohol since 1999, she admitted spending the night "in the drunk tank" in January 2010 due to suspicion of driving under the influence. At a follow-up visit on August 30, 2010, Lee could not sit still, but instead lay on the floor yelling. Her husband informed a staff member that Lee had been using drugs for at least three weeks prior to the visit and arrived home that morning after spending the night out. A LifeSkills social worker recommended that he take Lee to the emergency room because she was under the influence.

Lee was hospitalized at Western State Hospital from September 1, 2010, to September 13, 2010, and again from September 14, 2010, to October 5, 2010. She first was admitted after stealing and wrecking a truck while intoxicated. Lee told hospital staff that she was on drugs and "used whatever she could get her hands on," including "meth, crack, and pot." She told another staff member that she used "every damn thing I can get." By the time she was discharged on September 13, 2010, Lee showed considerable improvement and was stable. She presented no evidence of delusional thinking, and conversed with staff and peers adequately. Lee returned to the hospital the next day, however, after failing to comply with her treatment and reporting problems with her husband. Lee was discharged three weeks later on October 5, 2010, with a diagnosis of bipolar disorder with psychotic features and polysubstance dependence. After her hospitalization, Lee resumed treatment at Lifeskills in October 2010, at which time Dr. Buck diagnosed her with bipolar disorder and polysubstance dependence.

Drs. Jane Brake and Ed Ross, state agency psychological consultants, reviewed Lee's medical records. They indicated that Lee's mental impairments did not meet the criteria of a listing that would automatically qualify her for disability benefits. They further opined that Lee had mild restriction in activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation that each lasted for an extended duration. Both doctors concluded that Lee would be able to complete routine tasks in a setting that limited her contact with others if she abstained from substance abuse.

After Lee's application was denied by the Social Security Administration initially and on reconsideration, an administrative hearing took place on February 16, 2011. Both Lee and her non-attorney representative were present. Lee reported that her current medication helped her moods. As to her daily activities, she stated that she shopped with her husband and helped take care of him. She said she did some household chores, although she did not always finish them. Lee stated that she often watched television at home during the day, but that she and her husband occasionally went out to dinner and visited family members outside their home. Every now and then, family members came to their home, but Lee reported that she did not engage with them for very long.

To determine Lee's job prospects, the ALJ asked a vocational expert (VE) to assume a hypothetical claimant with the same age, education, and past work experience as Lee who could perform medium exertional work with an option to sit and stand at 30-minute intervals throughout the day. The ALJ asked the VE to further assume the hypothetical claimant was capable of one to two-step job tasks; could engage in occasional, but superficial interaction with supervisors and coworkers, but no interaction with the general public; and could not perform work in close tandem

with others to complete a task. The ALJ limited the hypothetical claimant to a low-stress work environment where no independent judgment is required. He defined low stress to mean little to no change would occur in the daily work routine, and no fast-paced production rate would be required.

The VE said that while medium exertional jobs did not exist in the national economy with the limitations the ALJ described, light exertional jobs—such as sorters, mailroom workers, and markers—were available. The ALJ asked the VE to assume the hypothetical claimant he previously described was capable of lifting 10 pounds frequently and 20 pounds occasionally, and occasionally reaching overheard with the non-dominant left upper extremity. The VE opined that the hypothetical claimant could still perform the three jobs with the additional limitations.

On February 25, 2011, the ALJ denied Lee's disability claim at the fifth and final step of the sequential evaluation process. He found that Lee's cervical and lumbar degenerative disc disease restricted her to less than the full range of light work with a sit-stand option and only occasional reaching overhead with the non-dominant left upper extremity. And he further found that Lee's depression and history of substance dependence limited her ability to deal with people, work stresses, and changes in work routine. Although the ALJ concluded that Lee was unable to perform her past relevant work, Lee could perform various jobs available in the national economy, such as sorter, mailroom worker, and marker.

Lee simultaneously appealed the ALJ's decision and filed a new application for benefits. On November 29, 2011—after receiving additional medical records from Lee, as well as the Commissioner's decision on Lee's second application finding her disabled—the Appeals Council affirmed the ALJ's decision. Lee then sought judicial review of the decision on her first application

in the district court. The magistrate judge recommended that the court affirm the Commissioner's decision, rejecting the four arguments Lee makes again in this appeal. Over Lee's objections, the district court adopted the magistrate judge's recommendations and affirmed the Commissioner's decision.

## II. ANALYSIS

Appellate review of the ALJ's decision "is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). "The substantial-evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Id*. at 406 (internal quotation marks omitted). "We give de novo review to the district court's conclusions on each issue." *Id*.

Lee levels four attacks on the Commissioner's determination—three on the ALJ's decision and one on the Appeals Council's refusal to remand the case for reconsideration. None are persuasive.

### A. Listing of Impairments

Lee first argues the Commissioner erred because she met the criteria for two disorders in the Listing of Impairments, a publication that describes detailed requirements for various conditions that prevent a person from performing any gainful activity. *See* 20 C.F.R. § 404.1525(a) (2012). A claimant who meets or equals a listed impairment is presumptively disabled, without consideration of her age, education, or work experience, *see* 20 C.F.R. § 404.1520(d), but she must first present medical findings that satisfy each criterion of the particular listing, *id*. § 404.1525(d). A claimant

can also show that her impairment, though unlisted, is "equivalent" to a listed one, but she "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). The Commissioner applies a heightened evidentiary standard for presumptive disability cases under the listings than for cases that proceed to other steps in the sequential evaluation process. *Id.* at 532. This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim. *Id.*

Lee specifically asserts that she met the criteria for Listings 12.04 and 12.09. Listing 12.09 defines substance addiction disorders as "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.09. If the substance addiction causes a depressive syndrome, a claimant meets Listing 12.09 by satisfying the criteria of other listings, including Listing 12.04. *See id.* § 12.09B. Listing 12.04 defines an affective disorder as "a disturbance of mood accompanied by a full or partial manic or depressive syndrome." *Id.* § 12.04. A claimant must satisfy either the criteria in both paragraphs A and B, or just in paragraph C of Listing 12.04. *Id.*

Lee argues the ALJ wrongly determined that she did not meet the criteria in paragraph B or, alternatively, in paragraph C. (The Commissioner concedes Lee's compliance with the paragraph A criteria.) To meet the criteria for paragraph B, Lee must show that her affective disorder results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, "each of extended duration." *Id.*

§ 12.04B. "Marked" means more than moderate but less than extreme. *Id*. § 12.00C. Lee primarily contests the ALJ's findings that her limitations in social functioning and maintaining concentration, persistence, or pace were less than marked, and that she had no episodes of decompensation, each of extended duration.

Substantial evidence supports the ALJ's findings that Lee did not meet the paragraph B criteria. As to daily activities, Lee stated she had no problems with personal care; could prepare meals and perform household chores such as laundry; shopped weekly; and could pay bills and count change. Dr. Harkenrider opined that Lee's limitations due to her depression and anxiety were mild at worst. As to social functioning, Lee said she spent time with other people, and that she and her husband occasionally went out to dinner and visited family. Although Lee had problems getting along with people, the ALJ noted that she "did not elaborate beyond reporting that she does not know what she is doing." As to Lee's ability to concentrate, Dr. Miller, the consultative examiner, reported that her attention and concentration were no more than mildly impaired.

Nor has Lee shown "repeated episodes of decompensation, each of extended duration," the final factor that can help her meet the criteria for paragraph B. *Id*. § 12.04B. Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning," and may be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id*. § 12.00C(4). Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing

household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id*. The regulations impose durational requirements that necessitate showing "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id*.

Lee suggests that her hospitalizations at Western State Hospital satisfy the decompensation requirement. Lee had only two hospitalizations. While both were undoubtedly serious, and the second one was longer than two weeks—meaning that it qualifies as an episode of decompensation—Lee's first hospitalization was not—meaning that it does not qualify. These two hospitalizations, then, do not meet the decompensation requirement in number—three episodes in one year—or duration—each lasting for at least two weeks.

Further, Drs. Brake and Ross reviewed the record and opined that the evidence did not establish the paragraph B criteria, including decompensation. Drs. Brake and Ross separately found that Lee had no more than mild or moderate limitations in daily activities, social functioning, or concentration, persistence, or pace, and no episodes of decompensation of extended duration.

While Lee challenges the weight the ALJ gave to the psychological consultants' assessments, she does not offer statements from her treating sources to rebut those assessments by indicating marked or extreme limitations in the relevant categories. "State agency medical and psychological consultants . . . are highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation," and whose findings and opinions the ALJ "must consider . . . as opinion evidence." 20 C.F.R. § 404.1527(e)(2)(i). In addition to their evaluations, the ALJ also noted that Dr. Pulliam, Lee's longtime primary-care physician, opined in July 2009 that Lee was "in good control of herself and functions well most of the time." Finally, the ALJ observed that Dr.

Buck, Lee's psychiatrist at LifeSkills, wrote that her condition improved with regular counseling and medication following her hospitalizations. In sum, substantial evidence supports the ALJ's determination that Lee's mental impairments—though apparently serious—did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, required to satisfy paragraph B.

Lee alternatively insists that she met the paragraph C criteria of Listing 12.04. To satisfy the paragraph C criteria based on episodes of decompensation, as Lee hopes to do, she must show a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04C. Lee cannot establish the paragraph C criteria because, as noted above with respect to the paragraph B criteria, the evidence does not show that Lee met the decompensation requirement.

While we recognize that Lee suffered from mental-health issues during this time, substantial evidence nonetheless supports the ALJ's determination that she did not meet or equal a listing. As a result, Lee's first attack on the ALJ's decision fails.

### B. Medical-opinion evidence

Lee next argues the ALJ improperly evaluated the medical-opinion evidence, giving too much weight to the opinions of the consultative and non-examining physicians, and too little to the opinions of Dr. Pulliam and Dr. Wan, the primary-care physician she began to see in July 2010 after

Dr. Pulliam retired. She also claims the ALJ did not consider the combined effect of her impairments.

The ALJ assesses a medical source's opinion on the nature and severity of a claimant's impairments relative to various factors, including: the examining and treating relationship the medical source had with the claimant; the evidence the medical source presents to support an opinion; the opinion's consistency with the record as a whole; and the medical source's specialty. *See* 20 C.F.R. § 404.1527(c). A treating physician's opinion is generally entitled to more weight and requires an ALJ to give good reasons for rejecting it. *Id*. § 404.1527(c)(2). But the treating physician's opinion is not binding on the Commissioner, who may discredit it if it is not supported by record evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Lee's argument that the ALJ should have given greater weight to the opinions of her treating physicians fails because none of the opinions that Drs. Pulliam and Wan expressed undermine the substantial evidence supporting the ALJ's decision. Lee notes that Dr. Pulliam treated her for anxiety and depression, and that Dr. Wan treated her for lumbar pain and mental impairments. But not every diagnosable impairment is necessarily disabling. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("[t]he mere diagnosis of [an impairment] . . . says nothing about the severity of the condition").

And further, the opinions of Lee's treating physicians cut against her position. "The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, [a claimant] must have a

severe impairment(s) that makes [her] unable to do [her] past relevant work . . . or any other substantial gainful work that exists in the national economy."  20 C.F.R. § 404.1505(a).

Lee stated that her disability onset date was September 18, 2009, but Dr. Pulliam observed after that date that Lee could return to work.  On September 23, 2009, for example, Dr. Pulliam wrote that Lee "can return to work after a week's rest at home."  On October 22, 2009, Dr. Pulliam determined that Lee's chronic anxiety and depression were serious enough to necessitate her leaving work from September 28, 2009 to December 31, 2009.  But he reconsidered that determination on October 30, 2009, noting that Lee was "much improved," "less manic," and "better controlled," and "should be able to return [to] work [doing] regular duties."  A few days later, Dr. Pulliam wrote that Lee could work as of October 30, 2009.  Dr. Pulliam's records indicating that Lee could return to work after less than two months do not help her show she was disabled.  Dr. Wan's assessment in the record, too, does not indicate that Lee was disabled, identify any functional limitations, or suggest limitations on Lee's ability to work.

Authority does not support Lee's assertion that the ALJ placed inordinate weight on the opinions of the consulting physicians.  To the contrary, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability hearing.  *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

In this case, the ALJ properly considered the findings of the consultative examiners, Drs. Miller and Harkenrider.  Dr. Miller observed that Lee spoke spontaneously and without pressure; had no discernible memory problems; was not delusional; and had fair insight and judgment.  Dr.

Harkenrider opined that Lee had no significant musculoskeletal limitations and normal range of motion apart from her neck, leading to only a mild level of limitation in job-related activities. The ALJ also did not err in considering the opinions of the state agency psychological consultants. Drs. Brake and Ross concluded that if Lee abstained from substance abuse, she could complete routine tasks if her contact with others was limited. The opinions of such consultants may be entitled to significant weight where, as here, they are supported by record evidence, including that from Lee's own physicians. *See* 20 C.F.R. § 404.1527(e)(2)(i).

Lee's final gloss on how the ALJ improperly evaluated the medical-opinion evidence—by allegedly failing to consider the combined effect of her impairments—is also unconvincing. The ALJ discussed Lee's physical and mental impairments, and included both types of impairments in his residual-functional-capacity (RFC) finding. The ALJ also found Lee did not have a "combination of impairments" that met or equaled a listed impairment. Lee does not explain how the ALJ failed to consider the combined effect of her impairments, nor how those impairments resulted in further limitations on her ability to work. As a result, Lee's second broad line of attack on the ALJ's decision cannot succeed.

## C. Vocational expert's testimony

Lee's third argument is that the ALJ improperly relied on the VE's testimony. We disagree. To determine if a claimant is disabled, the Commissioner undertakes a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920. In steps one through three, the Commissioner determines if the claimant (1) is engaged in "substantial gainful activity;" (2) has a "severe medically determinable physical or mental impairment" that meets the duration requirements; and (3) has an

impairment that "meets or equals" one of the listings in the Listing of Impairments. *Id*. §§ 404.1520(a)(4)(i)–(iii), 416.920(a)(4)(i)–(iii). The fourth step requires the Commissioner to assess the claimant's RFC to determine whether the claimant can perform "past relevant work." *Id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the answer to that question is no, the fifth and final step involves using that same RFC assessment, as well as a consideration of the claimant's age, education, and work experience, to determine if the claimant "can make an adjustment to other work" available in significant numbers in the economy. *Id*. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c). The Commissioner bears the burden of proof only on the fifth step. *See Jones*, 336 F.3d at 474.

As an initial matter, Lee complains that the ALJ improperly relied on the Medical-Vocational guidelines (or "grids") in the fifth sequential step. "An ALJ can use Medical–Vocational guidelines or 'grids' . . . at the fifth step of the disability determination after the claimant has been found not to meet the requirements of a listed impairment, but found nevertheless incapable of performing past relevant work." *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010). But the Commissioner "may not rely on the grids alone to meet its step-five burden where the evidence shows that a claimant has nonexertional impairments that preclude the performance of a full range of work at a given level." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008).

Here, the ALJ did not rely on the grids in a case-dispositive sense. Specifically, the ALJ reasoned that "if Lee had the [RFC] to perform the full range of light work," Medical Vocational Rule 202.21 would direct that Lee was not disabled. In the next sentence, however, the ALJ stated that additional limitations impeded Lee's ability to perform all or substantially all of the

requirements of this level of work. As a result, the ALJ proceeded to analyze the testimony the VE provided. We find no error in these circumstances.

The ALJ utilized the VE's testimony to determine the extent to which Lee's nonexertional limitations "erode the unskilled light occupational base." The VE identified several jobs a person with Lee's age, education, work history, and RFC could perform, such as sorter, mailroom worker, and marker. Lee raises three issues related to the VE's testimony. First, she objects that the ALJ did not include a push-pull limitation in his RFC or hypothetical question to the VE. Next, she alleges the VE's testimony was inconsistent with the Dictionary of Occupational Titles. *See* U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991). Finally, Lee claims that the VE's testimony actually supported her position because the VE testified that an individual with a score below 50 on the Global Assessment of Functioning scale would be unemployable.

We begin with Lee's first argument. A VE's testimony in response to a hypothetical question accurately portraying a claimant's vocational abilities and limitations can provide substantial evidence to meet the Commissioner's burden at the fifth step of the sequential evaluation process. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512–13 (6th Cir. 2010). An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ appropriately declined to include a push-pull limitation in his assessment of Lee's RFC or hypothetical question to the VE. The record supports this decision. For example, Dr. Harkenrider concluded in April 2010 that Lee had no significant musculoskeletal limitations and normal range of motion, except for her neck. This led him to conclude that Lee had a "mild" level

of limitation in job-related activities. Further, consistent with "mild" left sensory carpal tunnel syndrome and "mild" left sensory ulnar neuropathy Lee revealed in a nerve-conduction study, the ALJ limited her vocational abilities to only occasional reaching overhead with her left arm. Finally, the ALJ was justified in his decision because Lee did not testify to having significant difficulties with pushing or pulling. Indeed, she said only that she had trouble reaching with her non-dominant left arm, which, as noted, the ALJ recognized. Accordingly, the ALJ's hypothetical question, which included only those limitations he found credible, was not in error.

Lee's second argument—that the VE's testimony was inconsistent with the Dictionary of Occupational Titles—fares no better because the ALJ properly relied on the VE's testimony that the jobs she identified allowed for a sit-stand option. The ALJ's hypothetical question specified that Lee would need to be able to sit and stand at 30-minute intervals. The ALJ recognized that the Dictionary does not include a sit-stand option, but explained that he would accept the VE's testimony with regard to the three positions she identified based on the VE's extensive experience as a certified rehabilitation counselor. Federal regulations allow the VE to rely on sources other than the Dictionary in evaluating a hypothetical. *See* 20 C.F.R. § 404.1566(d). The ALJ could include a sit-stand option, even when such an option is not indicated in the Dictionary, because the Dictionary is only one source that can be used to assess the availability of jobs Lee can do. *See Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994).

Moreover, the ALJ asked the VE if her testimony was consistent with the Dictionary, and she answered that it was. This effectively satisfied the Commissioner's burden. *See Kyle*, 609 F.3d at 858. Lee's representative could have—but did not—cross-examine the VE concerning her

representation. The VE's testimony, then, provided substantial evidence that Lee could perform the jobs the VE identified.

Lee's third argument—that the VE's testimony regarding an individual with a Global Assessment of Functioning (GAF) score of 50 showed that Lee could not perform the jobs the VE identified—cannot prevail for three reasons.[1] First, Lee bends the meaning of the VE's testimony. The VE did not testify that a GAF score of 50 or below would preclude a person's ability to work in all instances. Instead, she said that such a score would preclude work activity "if the GAF is addressing [a claimant's] limitations and occupational functioning."

Second, the VE is neither qualified nor expected to interpret the functional limitations associated with a particular GAF score. The VE's testimony is "directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she 'can and cannot do,' there exist a significant number of employment opportunities for her in the regional and national economies." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). Because the VE is "not required to have any medical training, . . . any evaluation of medical evidence [she] perform[s] would be outside [her] area of expertise." *Id*.

Lee's representative asked the VE if an individual with a diagnosis of "psychotic disorder and bipolar disorder" who "receives psychiatric treatment" and "never exceeded a GAF rating of 50"

---

[1]The GAF scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health. It ranges from 0 to 100, with serious symptoms or impairment in functioning at a score of 50 or below, and moderate symptoms or impairment at scores between 51 and 60. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

could "sustain full-time employment." This required the VE to assess whether occupational limitations result from a score on a scale used by mental-health clinicians. The VE was not qualified to do so. The VE's hedged answer—that a GAF score of 50 or below would preclude a person's ability to work "if the GAF is addressing [a claimant's] limitations and occupational functioning"—underscores the point. The GAF scale considers three types of functioning—psychological, social, and occupational—two of which the VE is not trained to evaluate. In sum, the VE's testimony does not show Lee could not perform the jobs the VE identified because it required an assessment of medical evidence the VE was not fit to appraise.

Finally, "the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764–65 (Aug. 21, 2000)) (second alteration in original) (internal quotation marks omitted). As a result, the ALJ was not required to credit the VE's testimony regarding an individual with a GAF score of 50 or below. More broadly, substantial evidence supports the ALJ's reliance on the VE's testimony to find Lee could perform other jobs in the national economy.

## D. Appeals Council remand

Lee finally asserts that the Commissioner's decision was not based on substantial evidence because the Appeals Council refused to remand the case to the ALJ for further consideration in light of new evidence. She specifically points to 1) Dr. Wan's Medical Source Statement dated April 6,

2011; 2) an April 2011 treatment note Dr. Wan wrote documenting an "exam in April 2011 for the purpose of completing the Medical Source Statement," and 3) an April 2011 negative drug test.

Sentence six of 42 U.S.C. § 405(g) enables a district court to remand a disability case for further administrative proceedings in light of evidence presented after the ALJ's decision. To obtain a sentence-six remand, a claimant has the burden to establish that there is (1) new evidence; (2) which is material; and (3) that there is good cause for the failure to submit it to the ALJ. *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). Our substantial-evidence review of the ALJ's decision does not consider new evidence submitted after that decision is rendered. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Instead, we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand. *See id.*[2]

First, the district court properly refused to remand the case for further consideration of the Medical Source Statement. The first insurmountable hurdle Lee faces is that the Medical Source Statement was not made part of the Appeals Council record, nor was it submitted to the district court.[3] Dr. Wan's statement was completed after the ALJ's February 25, 2011 decision but before the Appeals Council denied Lee's request for review on November 29, 2011. While the Appeals

---

[2]Although the issue of whether we review a district court's denial of a request for sentence-six remand under a de novo or abuse-of-discretion standard is unclear, *see Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010), it does not matter here because we can affirm the district court's decision under either standard.

[3]In connection with this appeal, Lee filed a motion asking our court to amend the appellate record to include the Medical Source Statement. For the purposes of this appeal, the panel has reviewed this document but, for the reasons that follow, finds that the requirements for remand are not satisfied.

Council received additional evidence on August 23, 2011—none of which provided a basis to reconsider the ALJ's decision—this evidence did not include the April 6, 2011 Medical Source Statement Lee avers she previously mailed to the Appeals Council and now seeks to use.

When her case was before the district court, Lee was aware that the Medical Source Statement had been erroneously excluded from the record before the Appeals Council, but she still failed to submit it. She first noted its absence in the Fact and Law Summary she filed with the district court on May 28, 2012. Lee asserted the Appeals Council did not add the Medical Source Statement as an exhibit to the record (although she said she mailed a copy in), and asked the district court to remand her case for reconsideration in light of the Medical Source Statement. The Fact and Law Summary stated that this missing document was "attached as [an] exhibit[] to [Lee's] motion to supplement the record." But Lee never filed a motion to supplement the record in the district court, nor did she attach the Medical Source Statement to her Fact and Law Summary. Lee also failed to include it in her motion for judgment on the pleadings, as well as in the initial and amended memoranda that accompanied that motion.

Further still, Lee did not actually argue that the district court should supplement the record with the Medical Source Statement and remand on that basis. Instead, she pressed the claim that a negative drug test she submitted to the Appeals Council warranted remand to the Commissioner because it was new and material. The magistrate judge's report, recommending affirmance of the Commissioner's final decision, addressed only the drug test in the record. Lee's objections to the magistrate judge's report again mentioned the missing Medical Source Statement, but again did not include it.

On appellate review, we generally decline to take up an issue that is not raised in the district court. *See Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1002 (6th Cir. 1994). We do not need to rely on waiver here, however, because Lee cannot show good cause for failing to submit Dr. Wan's Medical Source Statement to the ALJ, which is necessary for sentence-six remand. Despite the fact that Dr. Wan started treating Lee in July 2010, Lee has not explained why she did not obtain this evidence before the ALJ's February 2011 decision. The same is true for the April 2011 treatment note documenting an "exam in April 2011 for the purpose of completing the Medical Source Statement."

Lee's current counsel argues that Lee failed "to order evidence that could have made a difference," because her former representative was not an attorney. But non-attorney status alone is insufficient to find good cause to justify Lee's failure to submit such evidence to the ALJ. Federal law explicitly carves out a place for non-attorney representatives in the disability-determination process, allowing claimants who may not have access to a lawyer a right to "appoint any person who is not an attorney to be your representative in dealings with [the Administration]." 20 C.F.R. § 404.1705(b); *see also* 42 U.S.C. § 406(a). This important right reflects the relatively informal nature of the disability-determination process and allows even claimants with modest resources to be represented in it. That notion, coupled with the convoluted record recounted above, leads us to conclude that the status of Lee's representative as a non-attorney—in and of itself—is not good cause to excuse the failure to procure necessary evidence in this case. Sentence-six remand is inappropriate to reconsider this evidence.

Next, Lee has similarly not shown good cause for the failure to submit the negative drug test to the ALJ. She does not explain why she did not obtain this test before the ALJ's decision, and again argues only that she had a non-attorney representative. For the reasons stated above, both arguments are unavailing. More significantly, Lee cannot show that the drug test is material. Post-hearing evidence is material "only if there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with [it]." *Foster*, 279 F.3d at 357 (internal quotation marks omitted). Lee offers the negative drug test to rebut what she views as the ALJ's improper conclusion that she had a substance-abuse problem. But even if we assume that an after-the-fact test would resolve the substance-abuse issue, a clean drug test does not lead to a "reasonable probability" that the Commissioner would conclude that Lee had greater mental limitations than the ALJ acknowledged. That conclusion is required if a different result in Lee's claim is to be reached. With respect to the negative drug test, then, Lee has met neither the good cause nor the materiality criteria for sentence-six remand.

Lee notes that the Commissioner granted her benefits on a subsequent application that incorporated the three pieces of evidence for which she seeks sentence-six remand, making the evidence material. But our precedent forecloses the sufficiency of this argument. "Under sentence six, the mere existence of the subsequent decision in [Lee's] favor, standing alone, cannot be evidence that can change the outcome of [her] prior proceeding. A subsequent favorable decision may be *supported by* evidence that is new and material . . . but the decision is not itself new and material evidence." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009). Lee has not satisfied the criteria for sentence-six remand.

## III.  CONCLUSION

The judgment of the district court is **AFFIRMED**.